ERNEST J. GRABOSKE AND BARBARA J. GRABOSKE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Graboske v. Commissioner
Docket Nos. 13731-82, 17514-83.[1]
United States Tax Court
T.C. Memo 1987-262; 1987 Tax Ct. Memo LEXIS 262; 53 T.C.M. (CCH) 896; T.C.M. (RIA) 87262; May 26, 1987. *262 Petitioners established a local chapter of the Universal Life Church, Inc. Bank accounts were opened in the local chapter's name, and amounts were withdrawn from accounts to pay for petitioners' personal expenses. Petitioners lived in a motor home which they moved from city to city due to petitioner-husband's employment as a contract engineer. Held, petitioners are not entitled to charitable deductions for amounts contributed to their local chapter of the Universal Life Church, Inc.Held further, petitioners are not entitled to deduct living expenses purportedly incurred while away from home. Held further, petitioner-husband is entitled to deduct contributions to an Individual Retirement Account for the years 1978 and 1979; held further, petitioners are liable for an addition to tax pursuant to sec. 6653(a); held further, petitioners are not liable for damages pursuant to sec. 6673. Peter Stromer, for the petitioners. Russell K. Stewart, for the respondent. WHITAKER
MEMORANDUM FINDINGS OF FACT AND OPINION WHITAKER, Judge: Respondent determined deficiencies in, and additions to, petitioners' Federal income tax for the years and in the amounts indicated: Addition to Tax
Petitioner
Year
Deficiency
Section 6653(a) [2] *263 Ernest J. and
Barbara J. Graboske
1978
$6,254
$313
Ernest J. Graboske
1979
14,064
703
Ernest J. Graboske
1980
22,171
1,109
Additionally, respondent made a motion at trial for damages pursuant to section 6673. The issues for decision are: (1) Whether petitioners are entitled to charitable deductions for amounts contributed to Universal Life Church, Travelers (ULC, Travelers); (2) whether petitioners incurred and properly deducted traveling expenses while away from home in the pursuit of a trade or business; (3) whether Ernest J. Graboske (Graboske) was entitled to deduct contributions to an Individual Retirement Account (IRA) for the years 1979 and 1980; (4) whether petitioners are liable for an addition to tax for negligence or intentional disregard of rules and regulations pursuant to section 6653(a); and (5) whether petitioners are liable for damages pursuant to section 6673. Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners Graboske and Barbara J. Graboske (Mrs. Graboske), husband and wife, were married *264 throughout the years at issue. [3] Mrs. Graboske resided in, and Graboske stated his legal residence as being, Seattle, Washington, at the time their petition for the taxable year ending December 31, 1978, was filed. Graboske stated his legal residence as being Wilkes-Barre, Pennsylvania, at the time his petition for the taxable years ending December 31, 1979, and December 31, 1980, was filed. [4] *265 Petitioners filed a joint individual income tax return for 1978, and Graboske filed as married filing separately for 1979 and 1980. On September 15, 1977, petitioners executed a Charter Agreement with the International Headquarters of Universal Life Church, Inc., Modesto, California (ULC, Inc.). Pursuant to said Agreement, charter number 20646 was given by ULC, Inc. to Graboske, Mrs. Graboske, and Henry C. Graboske as Pastor, Secretary, and Treasurer, respectively, of ULC, Travelers, a local chapter of ULC, Inc. As members of ULC, Travelers' governing body, petitioners agreed to abide by all church rules and Federal, state, and local corporate laws. Upon issuance of the Charter, ULC, Inc. agreed to furnish ULC, Travelers with a nonprofit status *266 and a Federal tax-exempt number for filing with the Internal Revenue Service. On April 10, 1978, Graboske opened a checking account for ULC, Travelers with the San Diego Trust & Savings Bank. On the account application, ULC, Travelers was listed as an unincorporated association and reported as its tax identification number the tax-exempt number provided by ULC, Inc. Graboske signed the application "Rev. Ernest J. Graboske, Pres." and gave his residential address as ULC, Travelers' business address. On August 25, 1978, Graboske opened a savings account for ULC, Travelers with San Diego Trust & Savings Bank. Graboske again gave his residential address as ULC, Travelers' business address, and gave ULC, Inc.'s tax-exempt number as ULC, Travelers' tax identification number. Stating his title as either president or pastor, Graboske was the only person authorized to make withdrawals from either account. Pursuant to the Charter Agreement, Graboske prepared and submitted to ULC, Inc. quarterly reports indicating services held, attendance, donations, and disbursements. The reports indicated that services were held between 9 and 17 times a quarter, and that an average of 5 to 10 people *267 attended each service. The donations stated on the report included all donations to ULC, Travelers, but Graboske was often the only contributor to the accounts. Graboske would deposit cash or a paycheck to one of the ULC, Travelers' accounts and would receive a cash receipt from ULC, Travelers signed by Henry Graboske or signed by Graboske or Mrs. Graboske for Henry Graboske as Treasurer. Additionally, Graboske maintained a cash fund of approximately $500 that was used for miscellaneous expenses. All donations for which Graboske received a receipt from ULC, Travelers were either deposited in the accounts or placed in the cash fund. On December 29, 1980, petitioners donated by warranty deed to ULC, Travelers real property situated on Camano Island, Washington. [5] Graboske did not receive a receipt from ULC, Travelers for the donated realty. Pursuant to a written request made by Graboske on March 29, 1982, ULC, Inc. issued annual receipts for "donations" made by Graboske to ULC, Travelers for the *268 years 1978 and 1980 in the amounts of $12,477 and $27,260, respectively. Graboske had previously received a receipt for 1979 in the amount of $13,896. Total annual contributions to ULC, Travelers and Graboske's annual contributions to ULC, Travelers as reflected in ULC, Inc.'s annual receipts, ULC, Travelers' quarterly reports, and ULC, Travelers' cash receipts are set forth below. ULC, Inc.'s
ULC, Travelers'
ULC, Travelers'
Year
Annual Receipts
Quarterly Reports
Cash Receipts
1978
$12,477
$14,600 $13,935 1979
13,896
14,500
13,897
1980
[6] 27,260
16,550
13,810
The ULC, Travelers' quarterly reports indicated disbursements for housing allowance, vehicle allowance, recreation, recruiting, and other administrative expenditures. The housing allowance for each quarter of the years before us was $1,500. Graboske used the housing allowance to maintain a house in Pennsylvania owned by Graboske, his mother, and brother and occupied by his mother. Additionally, the housing allowance was used to make payments on a truck and *269 trailer purchased by Graboske while living in San Diego and Seattle. The vehicle allowance for each quarter was $450, and was paid to Mrs. Graboske for the maintenance of petitioners' vehicles. The recruiting and recreation disbursements were for picnics, camping trips, food, drinks, frisbees, baseballs, and sleeping bags. Additional checks were drawn upon the ULC, Travelers' account by Graboske for the payment of his propane gas bill. Graboske did not have a personal checking account during the time he lived in San Diego. Consequently, he would write checks on the ULC, Travelers' account for his personal expenses and ostensibly reimburse ULC, Travelers by replacing money in the cash fund. The Charter Agreement listed ULC Travelers' address as Graboske's residential address in Chula Vista, California. ULC, Travelers was "scattered across the country" in 1978, with the church being physically located in San Diego, St. Louis, Los Angeles, Texas, and Tennessee. The church operated primarily in San Diego and Seattle in 1979, and mainly in Seattle in 1980. Services were held in the 26-foot motor home in which Graboske lived. The "dining area" where services were held was approximately *270 6 feet by 8 feet and could accommodate six adults. The driver's and co-pilot's chairs were adjacent to the dining area, and could accommodate several additional people. The 31-foot trailer was purchased as a "traveling church" and was used for part of the time in San Diego and Seattle. Graboske transferred the funds held in the San Diego Trust & Savings Bank accounts to the Seattle First National Bank at the time he moved from San Diego to Seattle for purposes of employment. Utilization of the ULC, Travelers' funds after their transfer to the Seattle accounts was similar to the use of the funds in San Diego. All checks drawn upon the San Diego Trust & Savings Bank account were signed by Graboske, and all withdrawals made from the savings account were executed by him. ULC, Inc. did not have an interest in, or control over, either the San Diego or Seattle accounts and did not make any withdrawals from either account during the years at issue. All decisions regarding the ULC, Travelers' funds were made by Graboske individually or in consultation with his wife and brother as members of ULC, Travelers' governing body. In January 1978, Graboske commenced employment with the Lancea Corporation *271 (Lancea) in Chula Vista, California. Graboske was employed as a senior design engineer, and did contract work for Rohr Industries Inc. designing airplane engine nacelles. Graboske was in Texas at the time he applied to Lancea for employment, and had last been employed by the McDonnell-Douglas Co., in St. Louis, Missouri. In addition to his base salary, Graboske was paid $10 per day, 7 days a week, as partial compensation for living expenses. During his period of employment with Lancea, Graboske lived in his motor home in which the ULC, Travelers' services were held. At the time Graboske was hired by Lancea, he did not know how long his employment with the company would last. Graboske was subsequently laid off by Lancea on June 8, 1979. Prior to his employment with Lancea, Graboske had worked for other aeronautical engineering firms in Missouri, California, Georgia, and numerous cities in Washington. On June 16, 1979, Graboske began employment with Kirk-Mayer Inc. (Kirk-Mayer), in Seattle, Washington. During the remainder of 1979 and through a portion of 1982, Graboske was employed as a structural engineer by Kirk-Mayer. Kirk-Mayer was working as a subcontractor of the Boeing *272 Corporation, and Graboske was designing doors and floors for the Boeing 757 airplane. Graboske continued to work for Kirk-Mayer through October or November 1982, although he was laid off four or five times during this period. Pursuant to Graboske's employment agreement with Kirk-Mayer, Graboske was to work for Boeing on an hourly basis. Kirk-Mayer made no representations as to the duration of employment and reserved the right to cancel the agreement at any time. Graboske was paid $16 per day, 7 days a week, in living expenses during the period that he was continuously employed with Boeing. To qualify for the per diem, Graboske was required to maintain a permanent residence at least 50 miles from the Boeing facilities, in addition to temporary living quarters near his place of employment. Graboske executed similar employment agreements with Kirk-Mayer on February 22, 1980, and June 20, 1980. The latter agreements each were amended to provide for a 6-month assignment. On December 22, 1976, Graboske opened an IRA account with the California Federal Savings and Loan Association. Graboske's initial deposit was for $1,500, and additional $1,500 deposits were made by Graboske during *273 1979 and 1980. Graboske's employment agreement with Lancea in 1979, and Kirk-Mayer in 1979 and 1980 did not provide pension plans of any kind. OPINION The first issue for decision is whether petitioners are entitled to charitable deductions for amounts contributed to ULC, Travelers. To secure a deduction for a charitable contribution under section 170(a), (b)(1), and (c), petitioners must establish that they have made an unconditional gift to a qualified entity. See De Jong v. Commissioner,309 F.2d 373, 376-379 (9th Cir. 1962), affg. 36 T.C. 896 (1961). Qualified entities under section 170 are essentially those organizations that qualify for an exemption from tax under section 501(c)(3). Although ULC, Inc. was at one time held to be a qualified entity, [7] that status has not been extended to local chapters such as the one operated by petitioners. Pursuant to section 170(c), charitable contribution is defined as follows: (c) Charitable Contribution Defined. -- For purposes of this *274 section, the term "charitable contribution" means a contribution or gift to or for the use of -- * * * (2) A corporation, trust, or community chest, fund, or foundation -- * * * (B) organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, * * *. (C) no part of the net earnings of which inures to the benefit of any private shareholder or individual; * * * The burden of proving entitlement to a deduction is on petitioner. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). Thus, petitioners must show that all requirements of section 170 have been satisfied. After considering the record herein, we conclude that petitioners have failed to carry their burden of proof. Section 170(a) requires that a charitable contribution actually be made within the taxable year for which a deduction is sought. It is well established that where a taxpayer retains dominion and control over the purportedly contributed property, no charitable contribution or gift has been made. See, e.g., Davis v. Commissioner,81 T.C. 806 (1983), affd. without published opinion 767 F.2d 931 (9th Cir. 1985); Aufiero v. Commissioner,43 B.T.A. 753 (1941). Graboske *275 was the only individual authorized to make withdrawals from ULC, Travelers' San Diego Trust & Saving's Bank accounts, and was the only individual to have in fact drawn upon either the San Diego or Seattle accounts. ULC, Inc. had no interest in, or control over, the funds at any time. By virtue of his signatory power over ULC, Travelers' accounts, Graboske retained control of funds deposited in the accounts, and consequently did not make a charitable contribution of them. Additionally, petitioners have failed to establish that ULC, Travelers was operated exclusively for exempt purposes as required by section 170(c)(2)(B). The services held in petitioners' motor home, and the picnicking and camping trips undertaken ostensibly for recruiting and recreational purposes, fail to convince us that ULC, Travelers was operated exclusively for exempt purposes. Finally, it is clear that some part of ULC, Travelers' assets inured to petitioners' benefit. The housing allowance was used to maintain Graboske's house in Pennsylvania while he lived in either San Diego or Seattle, the automobile allowance was used to maintain petitioners' automobiles, and various amounts were withdrawn from the accounts *276 to pay for propane gas and other personal items. Petitioners have not shown that their case is any different from the numerous other cases involving local chapters of ULC, Inc., in which taxpayers failed to prove that the deductions claimed by them were qualified charitable contributions. Graboske's control over the funds allegedly contributed and the inurement of the use of those funds to petitioners' personal benefit precludes deductibility. See, e.g., Davis v. Commissioner,supra at 815-819. Based on the foregoing, we conclude that petitioners have failed to meet their burden of proof with respect to charitable contributions purportedly made to ULC, Travelers, and thus deny any such deductions under section 170. The next issue for decision is whether petitioners incurred and properly deducted traveling expenses while away from home in the pursuit of a trade or business. The question turns upon whether Graboske was "away from home" when the expenses were incurred; specifically, we must determine whether Wilkes-Barre, Pennsylvania, was Graboske's tax home. Section 162(a)(2) allows a taxpayer to deduct ordinary and necessary traveling expenses, including amounts expended for lodging, *277 paid or incurred while away from home in the pursuit of a trade or business. The purpose of section 162(a)(2) is to mitigate the burden of the taxpayer who, because of the exigencies of his trade or business, must maintain two places of abode and thereby incur additional and duplicate living expenses. James v. United States,308 F.2d 204 (9th Cir. 1962); Kroll v. Commissioner,49 T.C. 557, 562 (1968); Verner v. Commissioner,39 T.C. 749 (1963). An obvious precondition to a taxpayer's being away from home is that he must first have a home from which he can be away. Bochner v. Commissioner,67 T.C. 824, 828 (1977); James v. United States,supra.If a taxpayer has no such permanent residence, then he is an itinerant for purposes of section 162(a)(2), and his tax home will be either his principal place of employment or the location where he physically resides. Whether petitioner had a permanent tax home so as to be entitled to deduct expenses under section 162(a)(2) is a factual question on which petitioner bears the burden of proof. Welch v. Helvering,290 U.S. 111 (1933); Rambo v. Commissioner,69 T.C. 920, 923-924 (1978); Rule 142(a). Graboske contends that Wilkes-Barre was his home *278 during the years in issue and that the claimed expenses were incurred while temporarily away from home due to business exigencies. Respondent's disallowance of the deductions is based upon the determination that petitioners were itinerants without a permanent place of residence, and that the expenses were incurred for personal, not business reasons. We decide this issue for respondent. [8] As a contract engineer, Graboske lived and worked in seven different cities on the eight jobs held prior to his move to Chula Vista. None of these prior jobs were in the State of Pennsylvania. Graboske's sole contact with Pennsylvania *279 appears to be his joint interest in the house lived in by his mother. There is nothing in the record other than Graboske's naked assertion to suggest that his permanent residence was in Wilkes-Barre. To the contrary, it is clear that Graboske lived in either his motor home or the attached trailer throughout his employment in Chula Vista. While petitioners made payments to maintain the house in Pennsylvania, they did not otherwise incur substantial continuing living expenses anywhere other than at their home in Chula Vista or Seattle. Therefore, we conclude that, as petitioners moved so did their home. Consequently, we decide this issue for respondent. The next issue for decision is whether Graboske was entitled to an IRA deduction in the amount of $1,500 for the years 1979 and 1980. Respondent contends that Graboske was entitled to participate in a qualified employees' pension plan and therefore was precluded from participating in an IRA. Graboske maintains that he was not entitled to participate in a pension plan with either Lancea or Kirk-Mayer. We decide this issue for Graboske. Neither the offer of employment from Lancea or the employment agreement with Kirk-Mayer made *280 any mention of employee pension plans. The Lancea letter discusses wages, living expenses, insurance, holidays, and vacation allowances. The Kirk-Mayer employment agreement makes no mention of a pension plan, and expressly states "this document contains the entire agreement between the parties." Graboske testified that he was not eligible for a pension plan during this period and we find that testimony to be corroborated by the employment contracts. Given the nature of Graboske's employment as a contract engineer, the absence of a pension plan is in no way surprising. We therefore decide this issue for Graboske, and allow the IRA deductions for 1979 and 1980. The next issue for decision is whether petitioners' understatement of income tax for each of the years at issue was due to negligence or the intentional disregard of rules and regulations pursuant to section 6653(a). Petitioners bear the burden of proof on this issue. Enoch v. Commissioner,57 T.C. 781, 802 (1972). Petitioners knowingly claimed a deduction as a charitable contribution for monies used to pay nondeductible household expenses. They are literate and intelligent adults, and as such they should have known better *281 than to deduct as a charitable contribution amounts channeled from themselves to a "church" which were then used to pay their personal living expenses. See Davis v. Commissioner,81 T.C. at 820-821. We conclude that petitioners deliberately chose to disregard the rules and regulations with respect to income taxes. Therefore, respondent's determination that petitioners are liable for additions to tax for each of the years at issue is sustained. The final issue for decision involves respondent's request for damages pursuant to section 6673. Section 6673 provides as follows: Whenever it appears to the Tax Court that proceedings before it have been instituted or maintained by the taxpayer primarily for delay or that the taxpayer's position in such proceedings is frivolous or groundless, damages in an amount not in excess of $5,000 shall be awarded to the United States by the Tax Court in its decision. Damages so awarded shall be assessed at the same time as the deficiency and shall be paid upon notice and demand from the Secretary and shall be collected as a part of the tax. Respondent orally moved for damages at the conclusion of the trial. After careful consideration of the record *282 before us, and in light of the stage of the proceedings at which respondent made his motion, we deny said motion and decide this issue for petitioners. Decisions will be entered under Rule 155.
Footnotes
1. On November 27, 1984, docket Nos. 13731-82 and 17514-83 were consolidated for trial, briefing, and opinion.↩
2. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue and all Rule references are to the Tax Court Rules of Practice and Procedure.
3. Pursuant to a decree of the Superior Court of Washington, petitioners' marriage was dissolved on October 22, 1981. Petitioners had executed a postnuptial agreement on June 23, 1978, setting forth the property rights and support obligations of each. Pursuant to said agreement, Graboske was obligated to provide Mrs. Graboske with the following items through the use and expenditure of his separate property: food, telephone, utilities, gasoline, medical insurance, and all expenses associated with temporary housing. Mrs. Graboske was obligated to provide the remainder of her necessities to the extent possible. ↩
4. The petitions contained Graboske's and Mrs. Graboske's legal residence as of the date the petitions were filed pursuant to Rule 34(b)(1). In an affidavit subscribed and sworn to by Graboske and attached to a motion for a change of place of trial, Graboske stated that his place of residence at the time of filing the petition for 1978 was Seattle, Washington, and that he subsequently moved to Wilkes-Barre, Pennsylvania. Graboske's petition for 1979 and 1980 was executed 5 days after the motion for a change of place of trial. Consequently, Graboske's change in legal residence as stated in the petitions appears to be correct.
5. On March 14, 1982, the donated realty was appraised at $22,000. There is nothing in the record to indicate the realty's value at the time it was donated by petitioners to ULC, Travelers.↩
6. The ULC, Inc.'s annual receipt received by Graboske for 1980 reflects one-half of the appraised fair market value ($11,000) of the real property donated by petitioners to ULC, Travelers.↩
7. The Internal Revenue Service has announced that it will no longer recognize the tax-exempt status of the Universal Life Church, Modesto, California. Announcement 84-90 (Sept. 4, 1984)1984-36 I.R.B. 32↩.
8. The Court has reached a similar conclusion in a growing list of cases involving contract engineers who have attempted to show attachments to their hometowns as bases for deducting their personal and living expenses under sec. 162(a)(2). See Spinks v. Commissioner,T.C. Memo. 1985-588; Lichtenberger v. Commissioner,T.C. Memo. 1985-370, affd. without a published opinion 789 F.2d 919 (7th Cir. 1986); Deamer v. Commissioner,T.C. Memo. 1984-63, affd. per curiam 752 F.2d 337 (8th Cir. 1985); Rohr v. Commissioner,T.C. Memo. 1982-117; Kaye v. Commissioner,T.C. Memo. 1974-111↩.